We'll call the next case, United States v. Corey Grant. Good thing I've got everyone here. Mr. Wilsberg is hogging the topic. All right, so I'm laughing because I was going to say assume the position, but please. I'm going to interrupt you before you begin. Whatever you want in rebuttal, you'll get. Okay, thank you. We'll start with that. What do you want? I asked for two minutes. Fine. Okay. So we asked you a question. What I'd like to do, because I have a lot of questions about this, but I think that we owe it to you because we asked you the question to give you an opportunity. I'm feathered by, as a mediator, to hear you out on this, not for an indeterminate period of time, but I'll at least be polite and give you a couple of minutes. That's great. I think we all understand exactly what the question is that's before the court and how it's framed by the cases beginning with Roper and going through Miller and Montgomery. So I won't repeat what we all know about the way in which the court has landed on this idea that life without parole for juveniles is not permitted in non-homicide cases and is only permitted in homicide cases in situations where the defendant has been held to be incorrigible and incapable of reform. So we all have that background and know what we're talking about. So the question then becomes, in essence, does life without parole include terms of year sentences that are not specifically denominated life without parole? That is to say, there's no question that if a court says I'm sentencing you to life without parole that Miller kicks in. The question now is, what happens if the court sentences you to some term of years and doesn't use those magic words? And then the second question, and really the question that I think the court's correspondence focuses on, is if so, how many years is it? So let me try to answer that in the analytic that I would propose. First, I think we all can agree, and I don't think the government really disputes clearly, although it's sometimes hard to tell from their brief, that there are some sentences that amount to de facto life without parole. If a defendant were sentenced to 150 years or 200 years or 100 years, that would be a sentence where we know that he would, and we use he because it's a he in this case, would die in prison. And because he was denied prison, the policy reasons that underlie Graham and Miller would apply. That is, that he would have no opportunity to ever achieve fulfillment outside the prison walls, to achieve a reconciliation with society, and would have no hope during the time that he was in prison. Those are the touchstones of the Graham-Miller analysis. And those would apply just as well to a sentence of 100 years or 200 years or, we say, a case like this, just as if the words life without parole were utilized. And to hold otherwise, just starting there, would be to elevate form over substance, as we argue, to hold the judicial system hostage to a label as opposed to the reality of what actually would be going on, which is that somebody would have been sentenced to die in jail. So now the question becomes, how do you know what that year, what that age is when somebody is going to die in jail? And, of course, that is a difficult question. There's two ways it could be answered. The best way is not one that this court can do. I mean, Congress could say, nobody, we're going to let everybody out when they reach age, fill in the blank, 50, 60, 70, whatever it is, or they can say that for juveniles. Congress has not acted. And, in fact, what Congress has done uniquely in the federal system as opposed to the state system, which makes this case much more difficult in some ways than the cases I've been arguing elsewhere in the state, is it's abolished parole. So there isn't even the opportunity to take a second look at some point down the road in 30 years, in 15 years, however long, and say, is this person closer to achieving rehabilitation or even to taking a look at how long they might live? So it's a much more difficult situation. It has to be done, other than the Miller re-sentencing that are taking place and has occurred here, it has to be done in the first instance by a sentencing judge operating using some sort of crystal ball. Let's talk about that crystal ball. So assuming that Congress doesn't do its thing, and I think there's good reason to believe it won't, the question is, what do courts do? And what I would respectfully say is that courts need to do their job and to understand that that's an issue. That is to say, a court should be determining how long a sentence can be without running afoul of Miller, without becoming life without parole. How will a court do that? It can use life expectancy tables. It can do that. We all know that those tables are, and this case shows how problematic those are, and they can be problematic in some very disturbing ways. So, for example, if you were to just do a very simple type of life expectancy table, women live longer than men. So does that mean that women can have longer sentences than men? These are disturbing pictures. I think we would agree that that's not the way to go. No. But what I would submit is that the right way to do this is for a court to make that call, to say, I'm sentencing you to this, and I don't think you're going to die in prison. I don't think this is life without parole, and here's why, because I think your life expectancy is this. That sounds weird, but courts do this all the time. Every day, courts are determining or looking at questions of life expectancy. They do it in the context of almost any tort where somebody dies, but certainly any kind of wrongful death type of tort. That has to be decided for purposes of damages. Courts are capable of making that determination. And so what I think should happen, and I will tell you this hasn't been fully briefed and it wasn't fully argued for sure, but the court asked. So I'm answering what I think the methodology ought to be. The right way to do this, and what this court ought to do, is it ought to say to district courts, if you confront this situation, you have to make a fact finding as to whether the defendant is in fact facing life without parole. And the way you'll do that is going to be a very highly nuanced thing. If it's my client, I'm going to call doctors and experts and so forth to say his actual predicted life expectancy is X. And then the court would have to shape its sentence accordingly. Because the first argument we make fundamentally is that if a sentence exceeds someone's life expectancy, that is de facto life without parole. And so a determination has to be made by courts. The way courts make all kinds of incredibly difficult determinations, particularly in the sentencing context, as to how long a person is likely to live. So that's point one. Okay, I'm sorry. No, no, no. I'm happy to stop there. Obviously, all of us and many others have been thinking about this a lot, right? So here's what I'm thinking about, right? So lots of language to deal with, but the one that seems to at least resonate with me is meaningful opportunity of release, right? So if you're trying to achieve meaningful opportunity of release, let's put Mr. Grant aside for a moment, right? He's 44, maybe 45 by now. I'm not sure that's important. We're supposed to be at least... He was born in July 4th, 1973. So he's 44. So we're thinking of this two ways, right? We're thinking of it, is there a way to create a rule for others to apply, and how does it affect Mr. Grant? So in most instances, if this is going to be addressed, the person is going to be between 15 and 18, right? So we're at that point. At the time of the offense. I'm so sorry? At the time of the offense, you mean? Yeah, right. I mean, 19 or 20 or whatever. Cold case, you find out about it 10 years later. I totally get it. But the point is, is that you're thinking about it in terms of that period of time. And then you have other language which talks about the opportunity for job rehabilitation and hope, et cetera. And the question is, at least as I'm thinking about it, is how do you achieve what the Supreme Court has set out for us? And life expectancy may or may not achieve that. The real problem is when you're looking at the question of incorrigibility, you've already gone through all of the factors, right? You've gone through the middle factors, right? So it can't be that now that you're going to be sentenced to a term of years that you have to go through those same factors again, right? You've already been deemed, as is true here, that you're not incorrigible. So to figure out what the term of years are, it just doesn't make sense to go through all of that again. So I totally get looking at life expectancy. But I'm trying to contextualize it. So let me ask you this question. Why wouldn't the meaningful opportunity for release mandate be satisfied if the juvenile offender is released at any point before the age of retirement? And here's why I say that, or why I propose that for our discussion. I'm not putting forth a theft. But you don't mean Judge Callen's retirement. He's never going to retire. He's got 100 years left. So we're trying to you suggested, right, that district judges could, in a more scientific and random way, come up with what your life expectancy is and then make determinations. But that's so variable, right, because of everyone's varying life expectancy. So I'm a Hispanic woman. I'm going to live longer. So, you know, my poor judgment with devastating impact on other people is treated one way. And I don't know what, you know, pick somebody up. A Caucasian woman is treated differently or an African woman. I'm not sure that makes sense at all. But if we keep in mind the Supreme Court's, there is a question. If you keep in mind the Supreme Court's attitude in mind about the meaningful opportunity for release, there's a universality of thought about the age of retirement. Now, I know the government has recently changed it, but most people think of it in terms of 65. And if you want a meaningful opportunity for release, you should be before 65. And if you're 15 and you're released at some point before 65, let's say you get 50 or so, you're still, upon release, you still have a meaningful opportunity for release at 15, thinking about that period of time in the future. So tell me about that. Okay. So lots to react to there. And I have 57 seconds, so I'm assuming that's no big deal. We can turn it on. Okay. Really, actually. Let me react to that a number of ways. First, I do think it's important. You've created an important distinction between the meaningful opportunity for release on the one hand and the opportunity for fulfillment outside of prison laws and reconciliation of society on the other. And I think what you're focusing on really is the second part of that. I think when Miller and Graham talk about a meaningful opportunity for release, they really were talking about the without parole aspect of the life without parole issue, and that really what states ought to do is give juveniles an opportunity for parole because of the fact that when they were first judged guilty and sentenced, they had brains that were still growing and developing and were in progress. And so these were ideal cases to take a second look down the road. And the real problem with those sentences was the without parole aspect of them. We've argued very hard that, obviously, without parole in the federal system, there isn't that meaningful opportunity for release. But you're talking about something different. What I think you're talking about, Judge Greenway, and correct me if I'm misunderstanding, is the idea that whenever you release, there still has to be some meaningful opportunity for life outside of prison laws, for reconciliation with society, for fulfillment. And you're 100% correct. Those are the underlying policies behind Miller and Graham, and they are the things that should be given life by whatever decision this court renders. So I completely agree with that. There are two different ways of going about it. One way of going about it, and I should say the way that most courts have looked at this so far, and most legislatures have looked at it, and this is all relevant, of course, for 8th Amendment proportionality analysis, what other jurisdictions do, has not been to look at the age issue, but has been to examine lengths of sentences. So in response to Miller, 12 states, and we can provide this information to the court if you're interested, it really was not part of the briefing of this, but 12 states have changed their laws. And primarily they've changed their laws in one of two ways. Either they've provided for juveniles to have an early opportunity to seek parole. That's about, I think, five or so states. And a number of other states have simply put caps on the sentences that can be imposed upon juveniles in the very first place. It may very well get to the same place. I can give you, and we haven't really provided this to the government, and I was just thinking about the question that you asked. Two states have capped juvenile sentences at 40 years. Four states, including New Jersey, where we argue this case in the Supreme Court and won, have capped it at 30 years. Two states have capped it at 25 years. And one state, West Virginia, has capped juvenile sentences at 15 years. But I'm just answering because it goes to one other possible way of solving this problem. I don't want to interrupt. I just want to qualify to make sure I understand. When you're quoting these numbers, you are talking about non-homicide. I'm sorry. You're talking about homicide. Correct. Yes, this is a homicide case. Yeah, yeah, yeah. A newer case as opposed to a grand case. Yeah, yeah. But I think these statutes actually apply across the board to both homicides. And after today, we'll send a letter to the court with all these statutory statutes. Yeah, absolutely. I'm sure. We have to have a rule of law. Right. And we charge it. We vacate it. We bring it back to the district court. And it has to be a sentence to tell the district court what the law is in resentencing this defendant. Right. And we want to do it without getting in trouble with the Supreme Court. We have to follow federal law. And do we have to pick a number out of play God and pick a number out of a hole out of the air? Or what more statement can we make that will give the district court guidance so that the district court will feel safe in saying they've been true to the mandate? I've thought about that a lot in preparation for this argument. And here's what I think, Judge Cowan, the answer to that is. This court, the district court in this case, did not consider at all these factors. It did not consider at all how much life Mr. Grant would have to lead outside of prison bars in order to have the fulfillment and the reconciliation that the Supreme Court discussed in Miller and Graham. And so what this court could do is it could make a recommendation that Congress solve the problem. And we know how seriously that recommendation will be taken. But seriously, it could require that district courts make that determination. And it could suggest something along the lines, Judge Greenway, of what you talked about, that we have ages that our society agrees upon as a matter of social consensus are significant ages. And, by the way, interestingly, these cases are cases that start with that consensus, because we really all know now that juvenile brain development continues way past 18. But as a society, we have a consensus that 18 is the number. One problem, by the way, and I'm not really quarreling with your formulation, Judge, but one thing. One problem with it, of course, is that if that were an age at which anybody would have to be released, and, by the way, not anybody would have to be released, right? Only people who were found not to be incorrigible. So that's the conclusion of the conversation. Not to be incorrigible. Right? So let me say, I mean, I want this to be 100% clear. Our position is not that every single juvenile defendant has to be released at some point. Life without parole remains a lawful sentence for juveniles who are found to be incapable of reform. This defendant, in this case, was not found to be incapable of reform, so we have to confront this issue. And so, you know, there's, I mean, we know that, you know, people's brains develop ultimately to 20s and so forth, but we still stick with the age of 18. One little problem is that, you know, somebody who goes to jail earlier is then going to serve a longer sentence than someone who goes to jail later, which is an imperfection. The notion of coming up with some age at which people should be released so that they have a meaningful opportunity to live a life, one that is not plagued by illness, one in which they still have family and friends around, one in which they still have some employment opportunities, and we've cited to the court the scholarship that shows that as one gets older, that becomes more difficult, you know, for somebody who's being released from prison, that, you know, that should be a consideration that the court should take into account in imposing sentence. So let me make sure I understand. So, okay, let's say the rule coming out of this was life expectancy. And I understand the disparity in consideration in this case between 76.7 and 72. But let's put that aside for a minute. So I'm always obsessed by rules. The rule coming out of this would be district court, look at life expectancy, take testimony, have a hearing, resolve life expectancy. And then, based on that, render a sentence with a number of years, and then go to considerations of meaningful opportunity for release and the rest that we've been talking about. At this point, that's where you are?  So here's how I would put it. It's only slightly tweaking your rule. I think the rule should be that district court should first determine whether a person is essentially serving life without parole because their life expectancy is less than the point at which they're going to be released from prison. That's not the case, let's assume. So then the question becomes, however, is this effectively life without parole? No. Then the question would be, then impose a sentence that will leave the defendant with a meaningful opportunity for life outside prison bars, assuming he's not incorrigible. So the sentence that's – so if life expectancy dictates that the defendant will die in prison, then the relief would be a sentence that will give him – the sentence that can be imposed must be one that will give him a meaningful opportunity for life outside of prison bars. That, I think, should be the rule. Okay. So outside of some medical malady, somebody between 15 and 18, regardless of gender, race, ethnicity, will have some life expectancy in futuro that will render the opportunity for a sentence to be quite long. Is there any other factor that we should look at besides life expectancy? Like, for instance, one of the things that the cases talk about, particularly Justice Kennedy and to a lesser extent Justice Kagan, is national consensus. You mentioned it before in a different context than what I'm making now, or international consensus. More easily derived that, although obviously some controversy with regard to the death penalty and with regard to life without parole as a general matter. Right. You agree that the notion that we're talking about, which is a little down the road, making the incorrigibility determination and going down the line, there's really no national consensus or international consensus that we can cite to. Is that fair? So there are two aspects. The reason you're talking about international and national consensus has to do with the way the Supreme Court undertakes disproportionality review. That proportionality review is undertaken these days basically in two steps. The first is to identify whether there is an international or national consensus around some issue. So, for example, there was an international consensus around the idea of not executing juveniles. But the second is that what we see more and more, and what you really see in these cases, is the Supreme Court and the lower courts bringing to bear science, social science, legitimate scientific evidence that bears upon the question. And that is very much the lesson, the profound lesson of these cases. In Roper, in Graham, and in Miller, there's discussion of the psychological evidence and the physiological evidence that juveniles' brains are undeveloped and that that causes the specific behaviors that are at issue with regard to the crimes that they commit. We can have an argument here about whether the Miller factors were adequately analyzed by the court. Here, obviously, we make our argument. But either way, part of the analysis is the science. And so that goes to your question about what factors would be considered. And I would suggest this formulation, that courts have to make a determination in deciding whether a particular sentence constitutes life without parole. First, as to life expectancy, and we've talked about that, and that can be done. And, by the way, you mentioned health concerns. I mean, those can be brought to bear. I mean, I'm diabetic. I'm probably less likely to live as long as others for that reason. And that can be brought to bear in a hearing if I were facing sentencing. And so that can be a fulsome type of hearing. Then the second is, how early does a person have to be released in order to achieve a meaningful life outside of prison bars? And the scholarship bears on that as well. Because we know that at certain ages that a person is likely to be too ill to have a – somebody who's been in prison is likely to be too ill, is likely to have very reduced job prospects, is likely to have a withering social and family network. We've briefed each of these issues and provided at least the beginning of that scientific analysis. But I think it also provides this court with a list of criteria that it can ask district court – require that district court judges apply in making that determination. Would there be some lesser figure or maximum figure that a district court could not go amiss of? For instance, saying at age 50 or 40, it's too soon, or if it's age 70, it's too late, to avoid any big act of life in prison. And is there – because the problem is every district court is going to have a different take on what is meaningful and what is to give someone hope in prison. And so there's no absolute rule if you say – if you go out back and say they evaluate the individual, and have you had the benefit of a scientific inquiry into the individual, determine when he can have self-fulfillment outside of prison and still have hope in prison or whatever. And not be serving a de facto prison sentence, even if the sentence is a few years less than it's might expectancy. But we have to have – we have to say it's – a sentence in the early 60s would be usually appropriate, unless other factors predominate to call it too few or too – or not enough. We have to give some guidance that this is the benchmark or the area we're talking about. Otherwise, you know, it could be as long or as short as the district court's thoughts. And you have no rule of law. Of course, it's the question. And in a lot of ways, I feel like you're asking me what's my opinion on this. Well, we are asking that because we have to write the – not that we might accept it, but we want to know what it is. And because we have to write an opinion telling a district court what the law is. So I feel – just completely candidly, I feel like this question is one that, in the best of all circumstances, as I mentioned up front, is one for a legislature. And when we argued this in New Jersey, the courts ultimately said, you know, we can't decide. Go back to the legislature on what the legislature said. They always said we're not going to permit sentences of longer than 30 years for juveniles. That was the New Jersey solution, which is the one that I've been involved with and I can tell you about. And has that been the same framework and incorrigibility dynamic? No. Well, so no, they didn't – you know, what the court said is our solution to Miller is we are – we're not going to have Miller hearings where incorrigibility is even measured. We're just going to say for juveniles given as a policy matter, we're going to say that, you know, that juveniles cannot have sentences of less – of greater than 30 years. That was that legislature's solution. And as I said, other legislatures have come up with other solutions, some lesser number of years, some greater. But that's not going to happen in a federal situation. If anything, you're going to say life is life and forget about all this nonsense. So, of course, that's the danger is that that's the easy answer. The easy answer is life without parole means life without parole. It's just not the just answer. And, you know, courts all the time have to decide whether to come up with the easy answer or the one that does substantial justice. Well, I mean, the Supreme Court has spoken. We're trying to give meaning to the Supreme Court because they've said if you're not incorrigible, you're in a different category. My own perspective is that the law is very clear that juveniles by the age of even 40 or so begin to age out from the time period from being likely to recidivate, to commit crimes in the same way. My own focus has always been that my own – for me, if I were solving this problem, I would solve the problem by saying that the maximum sentence that a juvenile should face is 30 years. And 30 years is a principled answer. It's a principled answer because in most states, here we have a consensus, at least juveniles become eligible for parole after 30 years in prison. And, of course, even under our own sentencing guidelines, if you look at the sentencing table, the highest sentence that somebody can get is 360, that is 30 years to life. So we view 30 years as a very serious – at the low end of the most serious sentence that courts can impose. And so we're dealing here with homicides. It's very serious offenses. And it strikes me that that would be a principled answer. You've actually asked a different question, though. You've asked a question about age. At what age must somebody be released in order for them to have a meaningful opportunity for life outside prison bars? To me, it's not just that different district judges will have different answers to that, but the truth of the matter is that the answer will be different for different defendants. There may be some who are more capable of being employed, who will have more robust family and social networks, who will have better health. And so the time might be later for them. As I was thinking, one of the principled reasons for choosing retirement is that a post-retirement release doesn't give meaning to the Supreme Court's considerations. Or at least the argument is there that it doesn't give meaning. So if that's where you are – I'm not asking you where you are. I'm saying as you think about this, if you want to give meaning to the various cases and the consensus among the cases as to how you're thinking about this, then, you know, if you're 18 at the time of the offense and you get an 80-year sentence and your life expectancy is, you know, whatever, pick a number less than 98, then, you know, obviously you're traversing the intent of those Supreme Court cases. So that's what I'm trying to grapple with. But I start in that thinking with the way you started, which is we have to empower district courts to exercise their discretion. And there are going to be differences. And I think, you know, we have to – you know, I've tried to write this last 30 years. I mean, I think it's – No, no, no. It feels legislative. I understand. I'm just saying, you know, so I think one way to think about that sort of formulation, age of retirement type formulation, which I think is really a brilliant one in a lot of ways, and you know that I don't always compliment you, that it could be a presumptive thing. I mean, you could say that presumptively people should be released at the age of retirement. There may be idiosyncratic circumstances that a district court should bring to bear and allow somebody to be incarcerated longer because of the nature and circumstances of the offense or the history and characteristics of the defendant, the typical 35-53-A factors. There may be some circumstances where 65 is going to be too old perhaps because of the person's health or because their relatives and friends are dying off or whatever. I think that it's a healthy way to think about solving this by using presumptive periods of time or presumptive ages that would accomplish the Supreme Court's goals. What's an example of a presumptive time that they should use as a median guideline for going up? What's an example of a presumptive time? So let's say it's 60 years. So if a person is convicted for a crime they committed between 15 and 18, call it 18, you know, at that point they would have served 42 years in prison. That's above and would comport in some ways or even be stricter than what we're seeing from what states are doing, which is important to the proportionality Eighth Amendment review. And so one could say that at the age of 60 that presumptively somebody should get out. The problem with that is that then a lawyer is going to get before a district judge and say, my client, he's 40 or he's 50, and really you can't get a job until you're 60 because you've got a criminal record, who's going to hire you anyway? And you have to at least say about 40 or 45. And the district judges are able to have that understanding of what it means to have a meaningful opportunity outside of prison, I hope in prison and so forth. But as other district judges, we have different feelings about that same person, and you don't want to have a disparity of decision-making. You need a rule that says this is the law, and it's such a wide discretion as to whether a district judge determines for this individual what is meaningful and what is fruitful and what gives you hope. These are terms like wisdom and so forth. What are you talking about here? The district judge, they want guidance. They want something where they're not going to get reversed. We have to have something here that supports what the Supreme Court opinions, and they gave us these guidance, but we have to fashion some sort of rule that a district judge can use in charging or deciding this issue. And I guess I'm suggesting a presumption because I just think that makes sense and would give district courts guidance, but let's be clear, and you're 100% correct, I mean, there's going to be variance, variability as between district judges. There always has been, even in the heyday of the sentencing guidelines era, different district judges would impose different sentences on the same defendant for the same facts. I mean, that is a fact of our system. You all are appointed by the President of the United States, and you get that discretion to make those calls. The rules that are provided are rules that are meant to dictate how you go about that reasoning process. And so what I'm suggesting is a reasoning process. I'm fine with a presumptive age, but one that considers certain factors and that requires just like district courts or trial courts now when they sentence are required to consider the Miller factors set forth by the Supreme Court, that there be a list of factors that are considered, the exact things that you're talking about, employment, family, health, that kind of thing, in making the ultimate decision. But it would be helpful, I think, for the district judges and in furtherance of the Supreme Court's mandate for that to include a presumptive age beyond which a person's release would not be affected. Now, in our case, Mr. Grant, one of the things that was proffered at his sentencing was that he had an employment opportunity. But what was not discussed, and the defense didn't produce it either, was how long that job opportunity would last. So now that would become a question, is how long would that potentially be out there? The inquiry would be fundamentally... That would be, you know, I mean, in most cases, right, we'd be talking about an 18-year-old, he might be 19 or 20. I mean, yours is admittedly unique. I don't know how unique it is. I mean, I think that there are standards... There won't be that many 44-year-olds because at some point, whoever is affected by the Miller case, whatever number of people who were in jail at the time Miller came out will sort of run the gamut of them. That will be over. And, you know, either whatever we come up with or some other circuit or finally the Supremes come up with will be applied to juveniles going forward and 18-year-olds going forward. That's right. So, you know, if an 18-year-old is found to be not culpable, I shouldn't be asking about whether he's a juvenile. That's right, and that's one of the reasons why really the federal system's abolition of parole does a disservice to the way things actually in the ideal world ought to be. You're stuck with that. You know, you're stuck with the Sentencing Reform Act having abolished parole. It's most unfortunate in these circumstances, and I was tempted when we were amicus parole to argue that the Sentencing Reform Act is unconstitutional because what Miller really says is that somebody should have a second look. I can see by your reaction how that argument would have fared here, and it would be a very hard argument. But that is the right, in some ways, that's the right answer, and because we don't have that right answer available, we're struggling with giving guidance to district court judges when they're sentencing somebody at 18 years old or so going forward. Okay, I think this is a good time for a break. You've been on your feet a lot. I appreciate it. I know Mr. Keller has a lot to absorb, and I'm going to put the light on just so I know when 15 minutes is up, and then we'll turn it off for as long as we have you. I very much appreciate that, Your Honor, and I have to start. Obviously, I have Bruce Keller representing the government here today, but this is a remarkable argument. I think that's an understatement. Very unusual. Perhaps what's most unusual about it is the degree to which there's agreement between a lot of the things that Mr. Westbrook said and what the government's position is in this case. Let me begin by reducing or eliminating any of the confusion. We agree that sentences that are very long fall under the same rules that the Supreme Court discussed in Miller and Graham. If it is 150 years, no argument. If it's 100 years, no argument. And why is that? It's because, absent some remarkable medical evolution, that is the fact that I'm going to mean that the prisoner stays in jail until the end of their life, and there's no dispute about that. Okay. Can I ask you then one question that will sort of focus it on this case? Let's assume for a moment that Judge Linares' sentence took Mr. Graham to 77 years. So that's past what you've calculated as his life expectancy. Is that a sentence that you would say is not in keeping with Graham at all? Very tough because it's a very close case for you to put right at the end of life expectancy, and I can spend some time. No, I put it past. Right at the end? Yeah, yeah. At the end. I hope you still respect what I wrote there. Understood. Makes the point. And we all have concerns about the limits of life expectancy as a measurement. And so I want to answer your question, but I can't give you a crystal until I set up the answer. Maybe I can try to do that. And I also want to be responsive to the obvious concern among the panel, that this is a case that cries out for guidance to be given to the district courts. And I have some guidance. I think I have a suggestion as to what you can do. But that's now taking me to the one area where we disagree. Does your de facto life expectancy include a sentence such as this case where the sentence is five years less than the expected life expectancy? Does that include your position? Our position is that there is no precise term of years that this court is capable of identifying as a rule either to be applied in this case or going forward. Because as this case has said, as this court has said, and as multiple courts have said, you're arguing for reasonableness, and reasonableness is a range and not a particular point. That's sentencing law. Let me tell you, there's a couple of other fundamental principles I think would be helpful if we get it out on the table, and then we can continue on with this discussion. And the first is the Supreme Court has made it almost impossible for you to come up with a particular number. They actually eschewed the opportunity to do that because, as Mr. Westberg and I were corresponding with each other yesterday, on October 2nd, beginning of this term, they did not grant cert in a number of cases that could have shed more light on the very issues. They just said, well, we're not going to touch it. So we're stuck with the law as it now stands. And where it now stands is that the Supreme Court has emphasized that it has not foreclosed, categorically, has not foreclosed any sentences other than life without parole. And even there, life without parole is okay for the irreparably corrupt. So we know that everything short of life without parole, whether it's a jury or de facto, is on the table as a possible discretionary sentence for a given district court. We also know that it has admonished lower courts repeatedly that one does not draw inferences about the scope of rights beyond the questions for which cert was granted. We cited one case at page 28 of our brief, that's the Glover case, said the same thing in a case that I think you were on the panel, Judge Powell, in the United Artists case, Texas against Cobb, 536 U.S. at 169, said you're not supposed to draw inferences beyond the scope of the question for which cert was granted. And we know that the cert granted in these prior juvenile sentencing cases is life without parole. What do we think about that? Everything short of that is essentially in a different universe. It's a binary system at this point. There's life without parole sentences, and let's put de facto among them, and then there's everything else. And, of course, this case involves everything else. The third principle is that the Supreme Court has said that advisories, though they are, federal courts are bound by the guidelines, and here the appropriate range included life. So we know that it's within the scope of a possible appropriate sentence. Two more points. The Supreme Court has also emphasized in juvenile sentencing cases, as in any case, that individualized sentencing is required. That's one of the key areas of agreement between Mr. Westberg and the government today. It's got to be individually tailored. And the final principle, and this court has repeatedly stated it, that when sentences are challenged as too long, the reasonableness review is where it is within a range of reasonableness. There is no exact point. And even if each of you on this panel were to disagree that or thought another sentence that Judge Linares might have issued, a shorter one, also could have been reasonable, that's not a grounds for reversal. Those are the principles that we are saddled with today. We don't really have a lot more guidance from the Supreme Court. So that takes me to the next point, which is that most of this discussion this morning has been about what legislatures are doing. And what they're doing is very important. No, I would disagree. And I want us to focus on what the Supreme Court has said. And I really don't want to focus on legislatures. So I don't either, other than to note that the law review article that Mr. Westbrook cited at page four of his reply, it's our French Russell, very enlightening. It sums up the sorts of statutes that he was just guiding you to. They're informative really only for this purpose. They show that the sorts of decisions that are being discussed today are inherently legislative and not judicial. And that underscores, well, look at how many factors you have to bring in. And you have to compare that to what the Supreme Court has said. Well, we can have a wonderful intellectual discussion about that at another time. But I just want to focus on the Supreme Court. So in the very, I think, narrow circumstance where we apply the Miller factors and there's a determination of a juvenile homicide individual who is deemed not incorrigible, right? So the question is, how do you give meaning to the words of the Supreme Court, right? I mean, a lot of considerations in what I think everyone would agree are the four main cases, right, Roper, Graham, Miller, and Montgomery, right? So I think we've spent a lot of time talking about the meaningful opportunity for release. But, you know, there's some discussion about, you know, not having folks come out of jail and living on the fringes of society. We could argue, well, it's dicta. Okay, great. But dicta from the Supreme Court, you know, is meant to inform us. Also, you know, there's quotes in Miller and Montgomery. I'm sorry, I don't remember, but about, you know, job training in jail and the opportunities that that would give to create meaning and hope upon release. So as we think about what guidance we can give, you know, I took copious notes on what you mentioned. I don't think there's any disagreement as to them. But, on the other hand, I'm trying to say, you know, how do we write something? So I'm going to identify the key area of disagreement that I have with Mr. Rusberg and I think is inherent in the question that you just proposed. I think a careful reading of Miller and Graham, if you really parse it, they do not stand for the proposition that once you get your opportunity, the opportunity being the opposite of life without parole. That's why I refer to a binary universe. There's either life without parole, the fact of the jury, and everything else. If you are in the everything else category, you get a chance, by definition, to get out of prison. That is all those cases have held to date. That's why I started by indicating I wish I had more guidance for you. But the language about meaningful opportunity is that Mr. Rusberg put his finger on it. It's a meaningful opportunity for parole. It says nothing about how meaningful your life will be after release. That may be rubbed the wrong way. It may seem unfair. But the holdings of the case— It's not a meaningful opportunity for parole, right? It's a meaningful chance to have hope while in prison that you get out of prison full stop. That's all it's told us to date. And I think the problem that we're having this morning in figuring out what are we going to do next is we're sliding past the distinction that it drew, and it's really crisp. It's life without parole, you have no hope. You have no chance of reconciliation. You have no chance of rehabilitation. You're stuck in prison. But if your sentence is less than life without parole, by definition, you're getting that chance. So your view of this is the way to look at this and the way to give guidance as you seek to give court of appeals is we start with life expectancy, and that's the only outer boundary that we set for the district court because we created a paradigm where that's the only outer limit. Do I understand you correctly? No, I'm not sure I was suggesting that. I think that we're all a little foggy right now. Let me just say that. I'm not foggy. I wonder what you said. Maybe I was the one that was foggy. Life expectancy is something you can take into account, but it is a limited— one of the other factors to take into account because once you post not incorrigible, it can't be that you then take consideration of all the factors that you've just applied to come to that determination again. That doesn't make any sense. So I think another area of disagreement is the role that life expectancy plays vis-a-vis all of the other traditional 3553A types of questions that one answers when one is sentencing, looking at the particular defendant. I don't think that we can answer this question in the abstract, and I'm not trying to buff your questions. I want to tell you that I think that as in any case, and again, Mr. Ruskirk suggested this, courts make hard decisions based on individualized defendants and their facts all of the time. This is no different in that sense, except it's not a sentencing going forward. And we sort of conflated those two things, too. A lot of what's been discussed today, what do we tell district courts to do going forward? You should take this opportunity, I submit, to remind them that you're guided by the 3553A factors, the guidelines are advisory, and you need to conduct a hearing that takes all of this into account before you propose sentence. Now that was done here, but it was done under the old system. The result was life without parole, mandatory life without parole. Mr. Grant got his opportunity that the Supreme Court was referring to when he had his Miller re-hearing, and that puts us squarely in the question of whether or not the 65 years falls within the range of unreasonableness that this court uses to assess every federal defendant. Unreasonableness. Whether you go with the Social Security tables, retirement tables, 401 tables, once someone has said they are virtually unemployed, even if they are able-bodied, educated, and willing, so you have to have some time if you have a sentence which is life or the fact of life. I don't want to call it geriatric, it's been referred to somewhat, but there's got to be some release for geriatrics that will give someone the opportunity in prison to hope they're going to get out, some hope that they'll live long enough to enjoy it on the outside. And then when they get out, that they can do some work, it may be shoveling snow or washing dishes, they're not going to be brain surgeons, but don't we have to say there's a point in society which I'm picking whole numbers out of the air, and somewhere in the early 60s, for instance, someone who is released after that has very little employment opportunity, they don't have that much even if they're released when they're 60, especially if you're dealing with a prisoner. Short of that, we agree with you I think about the legislation, that there should be a parole and there should be other, but we are dealing in the federal system, we're going to live with it, and we have to have an opinion here, which the Supreme Court will understand and accept. And so why can't we say anyone whose life expectancy is going to take them beyond that period, when they can have some hope in prison and some fulfillment out of prison, say that a base figure in the 60s and a judge should look at the individual and look at his individual credits and the merits as a employment, as an individual, and why this individual should be released when he's 60, or released when he's 64, or 75, or 70. But don't we have to have some base figure that you could say there would be some hope for employment, because I read the Supreme Court cases as saying we have to give some release to these people, we just can't keep them in for their life expectancy less than four or five years. That's not, someone's not supposed to live to be 75 and released on the 70th, they have no hope in jail. So, Your Honor, I can tell you right now you're really not going to like my answer, but I think that underscores the difference between what the Supreme Court actually said and what might feel like you want to do. The Supreme Court has said that there is a juxtaposition. There is the world of no hope, and then there's the world of hope. And they're talking about someone who is currently sitting in jail. They have not gone beyond and said how meaningful the life after release, which they're entitled to, add a meaningful opportunity in their lives. They've not said anything about it. How do you interpret the Supreme Court's refinement, if you will, of hope? One possible thing, connect that you and I have is, you know, we have the same vision. So I'm looking at these things and I'm saying, well, you know, why say all this? Why talk about employment? Why talk about a meaningful opportunity for release? I mean, we could take the position, or I'm so sorry, they could have taken the position that, you know, hey, you know, you did this, you know, you're in there, you know, that's it. They created this dichotomy, right? And I believe that part of what we're supposed to do is, you know, having seen the dichotomy that they've created, try to put some meaning to it. Now, they can slap our hands collectively and say, ah, that's not what we meant. Shut up. At least in the first instance, I have to say, give some meaning to it. So if I'm listening to you correctly and then getting the import of what you're saying, you say, yes, Judge, look at life expectancy, that's something we can look at. But then post-not encourageable, look at the 3553A factors, and that's enough to give district courts in trying to comply with this. Well, I think I'd go a little bit further than that. I think in this particular case. Okay. We're getting further. You're telling me something. Progress is good, Your Honor. I think that you would go in this case, and you should review very carefully everything that Judge Lamar's actually did, because I actually believe it is a textbook example of how to employ the various Miller factors to a defendant who was facing mandatory life in prison, got his Miller re-hearing for all the right reasons. Judge O'Donnell's opinion on that as to why he's entitled to the hearing is very persuasive. He had his hearing. He was represented not only by Mr. Westberg, his friend of the court, right, who filed a brilliant amicus brief. He had Mr. Glazer, a very experienced criminal law practitioner, and they put together a package of proposals for the judge, and he said six ways to Sunday, I am guided by Miller and Graham and Montgomery, and I need to take youth into account. But we've already crossed the Rubicon at that point. He's getting his opportunity for release. The question then becomes, at the opportunity for release, at the resentencing, what should a district court do? And there is complete agreement below that it is the 3553A factors, as informed by Miller from Montgomery. That is right in the record. There's no dispute. Everyone knew that 3553A is the touchstone. But you have to be poured into that analysis all that the Supreme Court has said about youth. And, again, that's another area of agreement that we have with Mr. Westberg. There are reasons that youth are treated differently. That's the basis of the opinions. You need to focus, fold them into the 3553A. My problem with what the district court did is, how did he comport himself with the Miller and the other factors when he released someone who had a life expectancy of, what, 75? And he's going to be released when he's 70. I mean, let's face it. At that point, this man has no expectation of employment. He's released at 70. You're right. And while he's in jail, what hope does he have for any meaningful opportunity outside of jail? You are right that those things are diminished the longer he stays in jail. It's not legal error in the district court that he made a daily determination which, as a practical matter, is completely at odds with what the Supreme Court has said a prisoner should have if he's going to be re-sentenced. So, two things. I don't think it's completely at odds because the court has not spoken beyond giving him the opportunity for release, which he clearly got. And the second and, I think, more important response is, this illustrates the wisdom of the prevailing standard of review of any sentence, which is, even if you think that was too long by five years, six years, could that be basis for reversal of the existing law of this circuit and the Supreme Court? And the answer is, it is not. Reasonableness is a range, not a particular point. That you disagree that it was a meaningful time, as long as he got that opportunity, is not a basis for reversal. If you do that, Your Honor, and obviously this panel can do whatever it wishes in that regard, you are in complete tension with so many other principles of sentencing law. I don't think it's a refuge to say, oh, we did it because Miller says we have to do it, because it doesn't say you have to do it. It says they're entitled, these prisoners facing life without parole for crimes committed as juveniles, are facing no hope because they got life without parole. That is what the Supreme Court said the Eighth Amendment forbids. The sentences are really clear in all of these opinions. Okay, so let's go back to a question that I think you were reluctant to answer earlier, and reluctance requires some intent, so maybe I can't do anything to defer to your reluctance. So you would agree then, if we were to end the argument right now, which I'm not necessarily contemplating, but if we were, you would agree that if Judge Linares gave a sentence of 77 years, that would not be in keeping with Supreme Court precedent. I agree with that. I know she spent time with Taylor. If it is beyond life expectancy, I started the argument by saying I agree with that. You also seem to be saying that there's no necessity for the Court of Appeals to establish a break-line test. You're also saying that. I'm saying that, and actually one step further, I think it would be an error for you to do so. Okay, so just as an aside, if he sends back a resentencing, if, what date do we take his potential life expectancy from? The original sentencing, the sentencing we have earlier, or the sentencing when he is in the district court for a really brief sentencing? So I think the answer to that does not turn on any legal issue. It turns on how is one used properly, life expectancy tables, and I don't think there's any disagreement that it's a meaningless table unless you apply it to the person that you're reviewing the life expectancy for. That's certainly how you get life insurance. You have the date that you're going to pick what your life expectancy is, and we have three different dates here, and it can make years of difference. Well, it can make some difference. I think it's not as dramatic as that, but there is a difference. I agree, but I think the answer has to be the only proper use, and we've cited the other circuit courts that have said this, Seventh Circuit, Second Circuit. The only proper use is use of the person's age at the time you are using the tables for whatever purpose you're using them for. That's how they're designed. That's how they work. You can't go back and talk. I think we're good. Thank you very much. Thank you. It's a point. No, thank you so much. Actually, I'm so sorry, because I just want to follow up on one thing. It's a point. No, I want to follow up on something, Mr. Keller. Mr. Keller makes a very good point. You know, everybody knows a little bit about insurance, and 76.7 would appear to be what they use as the basis for a 44-year-old. Why should we use 72? No, well, I think you wanted 72. No, 72 is how long he is when he'll be released under the current sentence. That's the only reason. No, that's a fair point. I'm not sure you did. I'm sorry. Let me say what our position is. I mean, our position has been that the right date to use for life expectancy tables is the date at the time of sentencing and not at the time of resentencing. Again, you mentioned this before. We're providing guidance with regard to going forward, and it's always going to be at the time of the sentencing. So I'm not sure that we have a major disagreement on that. In this case, using the much later date just because he happened to get his being resentenced under Miller does have some marginal disadvantage to him. But going forward, I think we don't have a disagreement. I'm going to be incredibly brief and just respond to just a couple of things. It is correct, Mr. Keller is correct, that the Supreme Court did not address the issue that's before this court today. Unfortunately, perhaps for you, fortunately for us, that doesn't mean that you don't have to decide this issue. And I think it's completely appropriate for you to engage in the dialogue that you're engaging in, and I think it's a very extraordinary opportunity in proceeding. We tried to give life to the words that the Supreme Court used about fulfillment outside of prison walls and about reconciliation with society. And we would just urge that as you go out writing the opinion that you're going to write that you require that district judges, including Judge Linares on remand, and I'll come in a moment to where I think the case should be remanded very briefly, that they should, in fact, consider those issues. How you go about considering those issues, whether presumptions exist as far as certain ages or certain times of years. And let me just say, I didn't mean to distract from the issue by talking about what legislatures have done. I agree that we're looking at the Supreme Court's language. The only reason I did that was to give you a sense of what's happened, which is relevant, as I said, to the whole proportionality analysis. But either way, I think that this is the opportunity for this court to give meaning and life to the words that the Supreme Court used, the rationale for it to have entered the ruling it did in Miller and Graham in the first place. That's what courts do in the second generation of cases. They try to make sense of not only the rule of law that's pronounced by the Supreme Court, but take it in the next series of cases to the next level by deploying its rationale. This case should be remanded for the reasons that both parties have briefed us at length, and I won't go into any detail. But we really do think that, as Mr. Keller made clear, that the 3553A analysis should be infused with the Miller factors. And we've set forth all the reasons why we think Judge Linares did not adequately consider those factors in his analysis, including most profoundly that what he said was that Mr. Graham's age was not an excuse. Well, Miller stands for the proposition that at least to a certain extent it is an excuse, not an excuse in the sense of a complete defense, but an explanation. Judge Linares, as well, did not fully consider it for the reasons that we've said in our brief, the family circumstances, truly tragic, that Mr. Grant faced, and incorporate all of those into his discussion. And there are other, his rehabilitative efforts and so forth, were not fully considered in the way I think that Miller contemplates. We also think that at the end of the day, Judge Linares should have sentenced him on a clean slate, that this really was a sentencing package, and that it's been full briefing by both sides with regard to the sentencing package doctrine. I don't think there's any question but that it was preserved. Mr. Glazer was here today, argued up one side and down the other that this was all of a piece. The order for resentencing, it said that there was going to be a resentencing. And at the end of the day, what the court had to do was to impose a sentence as a whole that comported with Miller. And that's why it didn't do that. And in particular, what it didn't do is to consider the very factors that this court is discussing today, and a read-in to the court would give it the opportunity to do that, and that's what we request. Thank you very much, and thank you again for this extraordinary opportunity. Thank you very much. Our pleasure, and, you know, I used to say this on the district court all the time, that these are really important issues, and, you know, if it's possible for federal judges to have fun, today was fun. Thank you all for your extraordinary participation. We'll take the matter under advisement.